**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| KIMBERLY DOE,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Cause No. 1:12-cv-605 |

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

JURISDICTION AND VENUE..........................................................................................2

PARTIES ..............................................................................................................................2

I.    Plaintiff Kimberly Doe ............................................................................................... 2

II.   Defendant ................................................................................................................... 3

FACTS...................................................................................................................................3

I.    ICE Has a Well-Documented History of Failing To Protect Detainees in Its Custody from Sexual Assault and Is Indisputably Aware of the Ongoing Risk to Detainees...................... 3

II.   ICE Policies and Standards Demonstrate Its Awareness of the Obvious Risk of Sexual Assault on Immigrant Detainees by Officers and Employees, Notwithstanding ICE's Failure To Enforce These Standards and Policies. ........................................................... 10

III.  Hutto's History of Non-Compliance and Assault Mandates the Already-Required Incorporation of Relevant Standards. ................................................................. 11

IV.   ICE Officers Nevertheless Failed To Require Implementation of the Relevant Preventative Policies.................................................................................................................. 15

V.    Donald Dunn Sexually Assaulted the Plaintiff. ................................................. 18

VI.   Sexual Assaults Were Committed by Defendant Dunn on Other Female Detainees. ......... 20

A.  Assaults Charged by the State of Texas, Williamson County ...................................... 21

i.    Victim Anna Roe ........................................................................... 21

ii.   Victim Sarah Doe........................................................................... 22

iii.  Victim Beth Roe ............................................................................ 22

iv.   Victim Constance Roe ................................................................... 22

B.  Additional Assaults Charged By the United States ........................................ 23

i.    Victim Dora Roe ............................................................................ 23

ii.   Victim Emily Roe ........................................................................... 23

iii.  Victim Faith Roe............................................................................ 24

iv.   Victim Raquel Doe ......................................................................... 24

    C.  Additional Assaults Not Used as the Basis for Criminal Charges.................................. 25

       i.  Victim Georgina Roe ........................................................................................ 25

      ii.  Other Victims .................................................................................................... 25

VII.  ICE's Failure To Remedy Continued Risk of Sexual Assault at Hutto Generally, and
     Victims' Vulnerability to Deportation Specifically, Compounded Plaintiff's Difficulty in
     Seeking or Obtaining Remedies for Her Assault.............................................................. 26

VIII. ICE Wrongfully Failed To Protect Plaintiff from the Obvious Risk of Sexual Assault...... 27

**CAUSES OF ACTION** ..............................................................................................**30**

**FIRST CAUSE OF ACTION**..................................................................................**30**

**SECOND CAUSE OF ACTION**.............................................................................**31**

**PRAYER FOR RELIEF**...........................................................................................**32**

# INTRODUCTION

1.      On April 15, 2010, Defendant Donald Dunn, an Escort Officer and Resident Supervisor at the T. Don Hutto Residential Center ("Hutto") in Taylor, Texas, sexually assaulted Plaintiff Kimberly Doe, a female immigrant detained by U.S. Immigration and Customs Enforcement ("ICE") at Hutto, who had fled repeated beatings and rapes by her husband in her home country of Brazil and sought asylum in the United States.

2.      Dunn is known to have assaulted or sexually assaulted at least nine other female immigrants between October 19, 2009, and May 7, 2010, when he transported them from the Hutto facility to either the Austin-Bergstrom International Airport (the "Airport") or the Greyhound Bus Station (the "Bus Station") after they were released from detention.  Defendant Dunn had the opportunity to assault these women because, contrary to the contracts governing the administration and management of Hutto and relevant ICE policies and standards, he alone was transporting them to their respective destinations without any other attending officer, much less one of the same gender as the transported detainee.

3.      Indeed, under its Intergovernmental Service Contract (the "IGSA") with Williamson County, the Texas county in which Hutto is located, ICE expressly required that "[d]uring all transportation activities, at least one (1) transportation officer shall be of the same sex as the residents being transported."  The contract between Williamson County and the Corrections Corporation of America ("CCA"), the private corporation in charge of managing the Hutto facility, expressly incorporated the terms of the IGSA.  Nevertheless, male transportation officers, such as Dunn, repeatedly and openly violated this requirement by transporting female detainees without the presence of another officer, much less a female officer.  Dunn took

advantage of these repeated violations by sexually assaulting numerous female detainees under his control during the course of transport.

4.      Plaintiff was severely traumatized by Dunn's assault on her.

5.      ICE and ICE officials were directly responsible for the assaults on Ms. Kimberly Doe and the other victims, as well as for the trauma resulting from these assaults, in that they failed to implement and enforce the contracts, policies, and standards clearly and obviously designed to protect these women.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in it arise under the Constitution and laws of the United States, including 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq*.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

8.      On or about April 12, 2012, an Administrative Tort Claim was submitted on behalf of Plaintiff Kimberly Doe to the U.S. Department of Homeland Security and U.S. Immigration and Customs Enforcement.  The claim was denied on April 30, 2012.  Plaintiff Kimberly Doe has exhausted her administrative remedies.

## PARTIES

### I.      Plaintiff Kimberly Doe

9.      Plaintiff **Kimberly Doe** is a native and citizen of Brazil.  Having been repeatedly beaten and raped by her husband in her home country, she fled to the United States seeking asylum.  Upon entering the United States for this purpose, she was detained and transferred to

the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  During the course of a transport scheduled and substantially controlled by ICE and ICE officers, Escort Officer Donald Dunn drove Plaintiff Kimberly Doe from the facility to the Airport as part of the release process.  Due to the deliberate indifference and negligence of ICE and ICE officers to the obvious risk of sexual assault, Defendant Dunn transported Ms. Kimberly Doe in the early hours of the morning of April 15, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually.  Kimberly reached the Airport, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result of Donald Dunn's assault and the deliberate indifference and negligence of ICE and ICE officers that proximately caused that assault.

## II.     Defendant

10.     Defendant **United States of America** is the government of the United States and is the appropriate defendant under the Federal Tort Claims Act.  28 U.S.C. § 2671, *et seq*.

# FACTS

## I.     ICE Has a Well-Documented History of Failing To Protect Detainees in Its Custody from Sexual Assault and Is Indisputably Aware of the Ongoing Risk to Detainees.

11.     ICE detains hundreds of thousands of people each year.  In 2005, the Department of Homeland Security ("DHS") announced a shift in immigration and detention policy from "catch[ing] and releas[ing]" to "catch[ing] and detain[ing]" immigrants.  Accordingly, the number of detainees in ICE custody has skyrocketed in recent years, rising from under 200,000

per year in 2005 to over 400,000 per year in 2010.  On information and belief, approximately 10% of these detainees are women.

12.     Individuals in ICE detention are civil detainees.  The majority of them have committed no crime other than at most that of entering the United States without inspection—a misdemeanor offense—and many have fled violence or persecution in their home countries and are seeking asylum in the United States.  ICE detainees are not serving criminal sentences and are not placed in detention for the sake of punishment, but rather to restrain their movement in the United States until their applications for status to remain in this country have been adjudicated.  Detainees who demonstrate a credible fear of persecution if they are returned to their home countries are eligible for release from detention during the pendency of their asylum proceedings.

13.     ICE houses the detainees in its custody at a variety of facilities spread throughout 27 states.  Some of the facilities are owned and operated by ICE.  Many are owned by local government entities or private prison contractors and are operated under contract with those entities.  According to ICE websites, eleven of these detention centers are in Texas, including the Hutto facility at issue in this Complaint.

14.     ICE has long possessed information that the detainees in its custody are subject to high risk of sexual assault.  As early as 1998, ICE's predecessor, the Immigration and Naturalization Service ("INS"), was defending lawsuits brought by immigration detention center residents alleging rampant sexual abuse (*see, e.g.*, *Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353 (D.N.J. 1998)) and was involved in investigations of employees accused of such abuse (*see, e.g.*, *U.S. v. Akram*, 152 F.3d 698 (7th Cir. 1998)).

4

15.     In 2000, the Women's Commission for Refugee Women and Children documented widespread sexual abuse of detainees at the INS Krome Service Processing Center in Miami, Florida.[1]  According to the Commission, "[w]omen at Krome reported that often officers used the women's lack of immigration status as an inducement to participate in sexual activities [and] that officers would make false promises that they could release a woman from detention if she participated in sexual acts."[2]  In other cases, "detainees said that deportation officers threatened them with deportation or transfer to a county prison if they resisted a guard's sexual advances or if they complained."[3]  A Department of Justice investigation in 2000 revealed that "roughly 10 percent of female detainees at Krome had come forward with reports of sexual misconduct by INS officers that included sexual harassment, fondling during searches, and sexual assault."[4]  According to the National Prison Rape Elimination Commission, "[t]wo women were impregnated by officers during their time at Krome."[5]  In 2002, Christina Madrazo, a former detainee at the Krome facility, brought a lawsuit alleging that an INS guard had raped her during her detention.[6]  Reports of sexual assault by officers on detainees at Krome have continued until at least as recently as 2008.[7]

16.     In 2002, Tony Hefner, a former security guard at the Port Isabel Service Processing Center in Los Fresnos, Texas, published *Between the Fences: Inside a U.S. Immigration Camp*, in which he detailed a wide variety of instances in which detention officers either solicited sexual favors in exchange for preferential treatment or other considerations or

---

[1] *See* http://womensrefugeecommission.org/press-room/557-sexual-abuse-widespread-at-krome-detention-center-miami-refugee-women-and-immigrants-subjected-to-.
[2] *Id.*
[3] *Id.*
[4] National Prison Rape Elimination Commission Report, June 2009, at 175.
[5] *Id.*
[6] Alisa Solomon, *Nightmare in Miami*, The Village Voice, March 19, 2002.
[7] *See* http://correctionofficersgoingwrong.wordpress.com/2008/04/06/ex-fed-agent-pleads-guilty-in-sex-assault-case/.

simply forced detainees to have sex.[8]  Hefner recounted having received a memo on this topic

from the Supervisor of Detention and Deportation at the facility which stated:

> It is only when [detainees] realize that the predators threatening their dignity and human rights are (the ones) keeping them detained, do they start to panic.  . . . All paperwork that a detainee signs, (advises) him/her that they [sic] will be protected during their deportation process.  But, the unofficial understanding informs them, you do what I tell you, or order you to do, and everything will be okay.  The most common threat is, cooperate, or I will deport you.[9]

17.     In 2003, an ICE agent was arrested and charged with felony sexual assault for

raping a young female immigrant detainee at an Arkansas motel where he took her instead of

bringing her to the doctor as he had been instructed to do.[10]

18.     On September 4, 2003, Congress enacted the Prison Rape Elimination Act

("PREA"), in which it specifically found, among other things, that (1) "[t]he high incidence of

sexual assault within prisons involves actual and potential violations of the United States

Constitution," (2) "the Supreme Court ruled that deliberate indifference to the substantial risk of

sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the

Eighth Amendment," and (3) that "States that do not take basic steps to abate prison rape

. . . demonstrate such indifference."  42 U.S.C. § 15601.  On information and belief, many of the

factors that lead to a high incidence of sexual assault in prisons are present in immigrant

detention facilities as well, such that the above-referenced Congressional findings served as

alerts and admonitions to all governmental and private entities involved in the administration and

management of such detention facilities.  As discussed below, ICE itself recognized this fact and

had incorporated PREA into its standards by December 2007.

---

[8] Tony Hefner and Jacalyn McLeod, *Between the Fences: Inside a U.S. Immigration Camp* (2002), pp. 14-16, 28-32, 36-40, 45-49, 59-67, 89-90, 92-94.
[9] *Id.*, p. 29.
[10] *See* http://spr.igc.org/en/news/2003/0924-3.html.

19.     In 2004, Stop Prisoner Rape,[11] an organization later lauded by the National Prison

Rape Elimination Commission as having played a pivotal role in its public hearings,[12] published

*No Refuge Here: A First Look at Sexual Abuse in Immigration Detention*, a study on ICE's

failure to prevent a multitude of instances of sexual abuse in its facilities.  The study recounted

numerous reports of sexual abuse of detainees by officers at immigration detention centers.

20.     In July 2006, the United Nations Committee Against Torture expressed its

concern about "reliable reports of sexual assault of . . . persons in . . . immigration detention [in

the United States and by] the lack of prompt and independent investigation of such acts and that

appropriate measures to combat these abuses have not been implemented by the [United

States]."[13]

21.     Rampant sexual assault and abuse of immigrants in ICE custody continued.

22.     For example, in December 2006, the Office of the Inspector General in the

Department of Homeland Security reported the firing of a guard following the investigation of

allegations by a woman detained at an immigrant detention center managed by CCA in San

Diego that the guard had raped her while the detainee was on work detail.[14]

23.     In May 2007, a guard at Hutto—the very facility at issue in this Complaint—was

seen crawling out of a detainee's cell at night in an apparent attempt to avoid video cameras.  At

the time, Hutto was used for family detention.  Remarkably, the guard allegedly sexually

assaulted the detainee while her son was sleeping in his crib inside the cell.  CCA fired the guard

and reported this incident to ICE as required by the terms of its contract by submitting a

---

[11]  Since 2008, Stop Prison Rape has been known as Just Detention International.
[12]  National Prison Rape Elimination Commission Report, June 2009, at xiii.
[13]  United Nations, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
Committee Against Torture, Thirty-sixth Session, Consideration of Reports Submitted by States Parties Under
Article 19 of the Convention, United States of America, ¶ 32.
[14]  Office of Inspector General, *Treatment of Immigrant Detainees Housed at Immigration and Customs
Enforcement Facilities*, December 2006, p. 28.

"Contract Discrepancy Report" to Williamson County on May 26, 2007, copying ICE's

Contracting Officer and COTR for Hutto.[15]  Not only did ICE have information about rampant

occurrences of sexual assault by officers and employees on detainees at immigration detention

centers in general, therefore, but ICE had information about such abuse at Hutto itself.

24.      In April 2008, a former ICE agent pleaded guilty to having sex with a detainee

while transferring her from one detention center to another in Florida.[16]

25.      In October 2008, a contract security officer reportedly sexually assaulted a female

detainee awaiting deportation at the Willacy Processing Center.  The officer who was the subject

of the 2008 report was recently charged with and pleaded guilty to sexual assault of a detainee.[17]

26.      In December 2008, widespread allegations surfaced of guards at the Pearsall

immigrant detention center in Texas sexually assaulting detainees.[18]

27.      In June 2009, the National Prison Rape Elimination Commission, a commission

created by Congress pursuant to PREA to study prison rape and recommend relevant prison

standards designed to prevent it, published a report noting that accounts of sexual abuse of

detainees by immigration detention center staff had been coming to light for more than twenty

years and detailing the many factors contributing to the particular vulnerability of such detainees

to this type of abuse.  In particular, the commission reported that

> [b]ecause immigration detainees are confined by the agency with the power to deport
> them, officers have an astounding degree of leverage—especially when detainees are not
> well informed of their rights and lack access to legal counsel.  The Commission learned
> that officers have propositioned women whose cases they control, telling them that if they
> want to be released they need to comply with their sexual demands.  The fear of

---

[15]  The guard was never prosecuted because federal criminal law at that time prohibited only sexual contact between
Department of Justice employees and those in their custody.  The Department of Homeland Security, created in
2003, was not subject to the same statutory regulations.  The law has since been amended.  *See* 18 U.S.C.A.
§ 2243(b).
[16]  *Ex-Fed Agent Pleads Guilty in Sex-Assault Case*, The Miami Herald, Apr. 3, 2008.
[17]  http://www.justice.gov/opa/pr/2011/August/11-crt-1016.html.
[18]  Brian Collister, *More Sex Assault Allegations at Immigrant Detention Center*, WOAI.com, Dec. 29, 2008.

deportation cannot be overstated and also functions to silence many individuals who are sexually abused.[19]

28.     In the summer of 2009, a non-governmental organization ("NGO") received numerous reports of sexual assault at the Willacy Detention Center.  The complaints were reported to ICE, and ICE deployed Dora Shriro, a Special Advisor on Detention and Removal, to visit the facility.

29.     In September 2009, a former contract guard at the Port Isabel immigrant detention center in Texas admitted to forcing a number of female detainees to strip in isolation cells at the center and assaulting them.[20]

30.     In the fall of 2009, ICE published a report by Dora Shriro entitled "Immigration and Detention Overview and Recommendations."  The federal government promoted the report as a blueprint for forthcoming reforms.  In a section titled "Special Populations," the report set forth numerous recommendations for the treatment of female detainees, including that the population of women in ICE custody should be consolidated in facilities "modified to meet their special requirements for safety and well-being."  The report observed that numerous facilities housing women were staffed primarily by men and recommended that female staff should be assigned to supervise the female population.  The report also recommended that the use of segregation or isolation cells for women should be discontinued immediately.  Finally, the report noted that the recent transition of the Hutto facility from a family detention center to a facility housing all female detainees "will enable ICE to implement gender-specific recommendations and assess their affects before implementing gender-specific recommendations as part of a national plan."

---

[19] Report at 22.
[20] Mary Flood, *Ex-Prison Guard Admits to Fondling Immigrant Women*, The Houston Chronicle, Sept. 24, 2009.

31.     Despite this long history of rampant sexual assault and perennial admonitions as to the necessity of change, there were at least 185 allegations of sexual abuse noted in ICE, DHS Office of Inspector General, and DHS Office of Civil Rights and Civil Liberties documents for one recent four-year period.  Of these, at least 56 reports concerned detainees in Texas.

32.     Moreover, according to data received through Freedom of Information Act requests, the DHS Office of the Inspector General and ICE together investigated at least 54 incidents of alleged sexual harassment, contact, and/or assault perpetrated by ICE officers or staff on detainees in ICE custody in the three years preceding December 18, 2009, the date of Donald Dunn's first known assault on a female immigrant detained at Hutto.  At least 32 (or more than half) of these incidents took place in Texas.  At least 4 of these incidents took place at the Hutto facility itself.  At least 3 of these incidents involved an officer, agent, or staff member sexually assaulting an immigrant detainee during transport to or from an immigration detention center.

33.     In light of the numerous reports of sexual abuse and assault over the course of decades, ICE and its officials and employees were inarguably acutely aware of the relevant risks female immigrant detainees faced from detention center officers and staff.

## II.     ICE Policies and Standards Demonstrate Its Awareness of the Obvious Risk of Sexual Assault on Immigrant Detainees by Officers and Employees, Notwithstanding ICE's Failure To Enforce These Standards and Policies.

34.     In December 2007, ICE issued policies and standards incorporating PREA and announced that ICE would exhibit zero tolerance towards sexual assault and abuse.  ICE/DRO Residential Standard: Sexual Abuse and Assault Prevention and Intervention, dated December 21, 2007.  The applicable standard specifically observes that:

[r]esearch indicates that a small percentage of individuals express aggression and seek to dominate others through violent sexual behavior. Forceful and pressured sexual interactions are among the most serious threats to resident safety and institutional order. Victims may suffer physical and psychological harm, and could be infected with a life-threatening disease. . . . Not only does ICE/DRO expect all facilities to affirmatively act to prevent sexual abuse and assaults on ICE/DRO residents, but it also takes very seriously all allegations of sexual misconduct and assault against any ICE/DRO resident in any facility. Every allegation is reviewed and, where warranted, referred for criminal prosecution, with a 'zero tolerance' standard. *Id.*

35.    Moreover, aware that officers and staff had positions of such authority and control that they could carry out acts of sexual assault and abuse against immigrant detainees with greater ease and less likelihood of repercussions, ICE developed standards specifically prohibiting officers and staff from "[e]ngaging in, or attempting to engage in a sexual act with any resident or the intentional touching of [a] resident's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person" and noting that "[s]exual acts or contacts between a resident and a staff member, even when no objections are raised, are prohibited acts." *Id.* at § V.D.2.

36.    ICE fully understood the threat of sexual assault during transport, noting in relevant transportation standards that "[w]hen transporting residents of the opposite gender, it is good practice for staff to call in their time of departure and odometer reading and then do so again upon arrival, to account for their time." ICE/DRO Residential Standard for Transportation (By Land), § IV.S.11 (dated December 21, 2007).

## III.   Hutto's History of Non-Compliance and Assault Mandates the Already-Required Incorporation of Relevant Standards.

37.    Hutto is a contract detention facility in Taylor, Texas, operated by CCA. CCA is the largest private, for-profit provider of detention and corrections services for adults in the United States.

11

38.     The federal government reportedly pays CCA, through Williamson County, approximately $2.8 million per month to house a minimum of 461 detainees per day.

39.     Williamson County reportedly charges CCA an administrative fee of approximately $15,000.00 per month.  In addition, CCA pays Williamson County $6,000/month to defray the costs of the Williamson County representative hired to serve as the County's monitor for an annual total of $72,000.00.

40.     CCA owns the Hutto facility and the land upon which it sits.  CCA bought the land in 1996, during the first wave of private prison expansion, and constructed the facility in 1997 with the intention of housing federal inmates.  The federal government pays a higher per diem than other custodial entities and as a result its contracts are the most lucrative and the most highly prized.  By 2004, however, CCA's stock had dropped and the company was facing bankruptcy as result of over-building, mismanagement, and a number of deaths and riots at its prisons.[21]  CCA deemed Hutto underutilized and was planning to shut it down when, in 2005, the federal government announced a request for proposals for a facility to detain immigrant families.[22]  CCA won the contract and began housing immigrant families at the Hutto facility pursuant to an Intergovernmental Service Agreement with ICE, through Williamson County, in May 2006.

41.     Shortly after Hutto was re-opened as a facility to house detained immigrant families, immigration attorneys with clients at the facility began to report serious concerns about the treatment of the detainees, particularly the children, incarcerated there.  On March 7, 2007, the ACLU, ACLU of Texas, University of Texas Immigration Clinic, and Dewey and LeBoeuf LLP filed a federal lawsuit on behalf of ten children who were detained with one or both of their

---

[21]  Getahn Ward, *CCA Brings Old Hand Back to Operation*, The Tennessean, December 16, 2004.
[22]  Getahn Ward, *Immigration Crackdown Creates New Profit Opportunity for CCA*, The Tennessean, May 21, 2006.

parents at Hutto.  *In re Hutto Family Detention Center*, No. A-07-CA-164-SS (W.D. Tex., Austin Div. – Sparks, J.).  The suit, which ultimately included 26 plaintiffs, alleged numerous violations of the settlement agreement to which ICE's predecessor agency, INS, was bound in *Flores v. Meese*, No. 85-cv-4544 (C.D. Cal., Nov. 1997) ("*Flores* Settlement").  The *Flores* Settlement established minimum standards and conditions for the housing and release of all minors in federal custody.  The plaintiffs claimed that the following conditions at Hutto, among other things, violated the *Flores* Settlement: the placement of children in a punitive setting, including forcing them to wear prison garb and housing them in locked cells with exposed toilets, cameras and lasers to monitor movement out of the cell, and lights that were left on all night for monitoring; seven-times-daily lockdowns for "counts;" the denial of food and nutrition adequate to support growing children; the denial of education; the deprivation of outdoor recreation; the denial of access to counseling, education, and other services; the disciplining of children for playing, running around, or engaging in similar activities; the use of separation of children from their parents as a disciplinary threat to force behavior compliance; and the use of separation of children from parents as a threat to force parents to sign deportation orders instead of pursuing claims for immigration relief in the United States.

42.     As noted above, in May 2007, during the pendency of the *In Re Hutto Family Detention Center* litigation, a guard employed by CCA at the Hutto facility was discovered to have stolen into a detainee's cell and had sex with her while her child was present.  The guard was subsequently terminated from employment but not criminally charged.

43.     In a November 2008 Annual Compliance Review, DHS found the Hutto facility "not-compliant" with respect to applicable ICE standards regarding sexual abuse and assault prevention and intervention.

44.     On August 27, 2009, the parties in the *In Re Hutto Family Detention Center*
litigation entered into a settlement agreement (the "Hutto Settlement Agreement") pursuant to
which ICE agreed to make numerous, substantial changes to the conditions of confinement for
children at the facility.  The Hutto Settlement Agreement included a two-year compliance
monitoring period and designated Magistrate Judge Andrew Austin as the monitor.

45.     Shortly before the Hutto Settlement Agreement terminated on August 27, 2009—
as part of a much-publicized announcement that the federal government was moving to
substantially overhaul and improve the nation's troubled immigration detention system—ICE
officials announced that ICE would cease detaining families at the facility and voluntarily agreed
to extend the terms of the Hutto Settlement Agreement until all families were transferred out of
the facility.  On information and belief, the transfer was completed by September 17, 2009.

46.     Shortly thereafter, ICE began using the Hutto facility exclusively to house
immigrant women.  Soon, ICE began touting Hutto as a model facility, dedicating a page on
ICE's website specifically to Hutto and regularly citing the facility as exemplary in meetings
with NGOs and immigrants' rights advocates.

47.     ICE incorporated the 2007 sexual assault and abuse prevention standards into its
Intergovernmental Service Agreement with Williamson County governing the administration of
the newly configured Hutto facility (DROIGSA 10-0002; the "IGSA").  In this IGSA, ICE
specifically required that "[d]uring all transportation activities, at least one (1) transportation
officer shall be of the same sex as the residents being transported."  Williamson County, in turn,
incorporated the terms of the IGSA into its contract with CCA setting out the terms by which
CCA would operate the Hutto facility.  The latter contract is by its own terms "governed by and
construed in accordance with the laws of the State of Texas[.]"  CCA Agreement, ¶ 15.

48.     In an October 6, 2009, Fact Sheet issued in conjunction with Dora Shriro's Report and the government's announcement that it was overhauling its civil detention system, ICE announced that "[e]ffective immediately, [it would] aggressively monitor and enforce contract performance in order to ensure contractors [would] comply with terms and conditions— especially those related to conditions of confinement."  As part of this effort, ICE further announced its "intent to hire 23 federal employees to provide on-site oversight at ICE's largest detention facilities."  According to an August 12, 2010, Fact Sheet published by ICE, part of the training for all of these "detention service managers" took place between March 22, 2010, and April 9, 2010, at the Hutto facility itself.  ICE ostensibly assigned one of these detention service managers to Hutto in April 2010 after the conclusion of this training.

49.     ICE's actions with respect to incorporating relevant standards, insisting on aggressive monitoring and enforcement of contract provisions, and appointing new oversight officers bespoke a recognition that the risks of sexual assault on immigrant detainees by detention center officers and employees during transport, both at Hutto and elsewhere, were real and obvious and that ICE and ICE officers had the responsibility to prevent such assaults.

## IV.   ICE Officers Nevertheless Failed To Require Implementation of the Relevant Preventative Policies.

50.     Notwithstanding the chronic reports of sexual assault against detainees in ICE custody by staff at ICE immigration detention centers, the ever-increasing visibility of and publicity surrounding such assaults, and ICE promises to enforce contract terms aggressively, ICE and ICE officers failed to ensure compliance with the terms of the IGSA governing transports and sexual assault prevention at Hutto.

51.     As just one example, ICE and ICE officers failed to ensure the issuance of general orders to officers and employees transporting detainees which were consistent with and reflected

the relevant ICE policies and standards.  ICE/DRO Residential Standards provide that Post

Orders, which govern facility employee conduct and job duties, provide "step-by-step procedures

in sufficient detail to guide a staff member assigned to that post for the first time."  On March 13,

2009, CCA issued Policy 9-101, which clearly mandated that "[o]nly staff of the same gender as

the residents being transported will be assigned to transport residents that bond out."  However,

just a week later, on March 20, 2009, CCA issued Post Order 17, entitled "Transportation,"

which purported to govern the transportation of residents offsite, but did not specify by its own

terms and procedures that at least one female officer escort any female detainee in any transport.

Post Order 17 did not provide sufficient detail, or indeed any detail at all, with respect to the

requirement clearly mandated by ICE's policy that at least one female officer escort any female

detainee in any transport.  Such omissions and oversights were no mere matter of muddled

paperwork.  On the contrary, under the circumstances in which CCA provided transport to

female detainees—transports scheduled and substantially controlled by ICE and ICE officers—

and in the face of the clear risks presented by those circumstances, these omissions and

oversights constituted deliberate indifference to the obvious risk of sexual assault on female

detainees, as well as negligence.

52.     ICE and ICE officers exhibited this deliberate indifference and negligence in the

face of conditions in which the need for their constant attention to these issues was particularly

acute.  Escort officers were in such complete control of all aspects of the transport that they

unquestionably had every opportunity to "express aggression and seek to dominate others

through violent sexual behavior" in the manner warned of in the applicable ICE standards

referenced above.  Not only were escort officers in complete control of the transported detainees,

but they alone understood the geographical details of the locale generally and of the route to be

taken specifically.  The escort officers, of course, spoke English, a language unfamiliar to many of the detainees, and, unlike the detainees, could fluently communicate with anyone with whom they had cause to interact.  The escort officers had the trappings of authority that would tend to prevent any challenge to their actions either from the transported detainees themselves or from any possible local bystanders.  Finally, they were transporting the detainees to the airport or the bus station, from which the detainees would immediately leave the area.  The detainees would have little time to report any incidents, would have great difficulty reporting such incidents in any event due to communication difficulties, and would not remain in the area long enough to assist with any investigation of such incidents.  Indeed, such detainees might ultimately face deportation and be forced to leave the country altogether.

        53.     Despite such indicators of the obvious risk of sexual assault on transported detainees by escort officers and employees, ICE did not implement the preventative measures called for by the relevant contracts and by its own policies and standards.  On the contrary, on numerous occasions a single male officer transported female detainees in contravention of the IGSA and relevant ICE policies and standards.  In fact, according to information received from Williamson County, on at least 46 occasions between October 19, 2009, and May 6, 2010, a single male officer transported a single female detainee.  On at least 14 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m., a time of day in which, on information and belief, the route to the Airport was dark, the roads were deserted with little vehicular and no pedestrian traffic, businesses were closed, and there was generally nothing likely to occur in the course of a transport that would interfere with an escort officer's ability to abuse his authority and control of the situation.  Of the 46 or more occasions in which a single male officer transported a single female detainee between October 19, 2009, and May 6, 2010, at

least 44 involved transport to an airport or bus station, compounding the difficulties that any transported detainee would have in reporting any incident.

54.     On at least 31 other occasions between October 19, 2009, and May 7, 2010, a single male officer transported multiple female detainees.  On at least 7 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m.  At least 30 of the 31 occasions involved transport to an airport or bus station.

55.     In sum, between October 19, 2009, and May 7, 2010, at least 22 distinct male officers were involved in the at least 77 transports in which a single male officer escorted female detainees without a female escorting officer present.

## V.     Donald Dunn Sexually Assaulted the Plaintiff.

56.     Donald Dunn, a CCA employee at the Hutto facility until May 24, 2010, with the title of Escort Officer and Resident Supervisor, transported female detainees to the Airport or Bus station in late 2009 and the first half of 2010 with no other accompanying officer on at least 11 occasions.  On at least 10 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m.

57.     Dunn took advantage of the extreme level of control the deliberate indifference and negligence of ICE officers allowed him to exercise over these transports and the transported detainees to commit sexual assault against the Plaintiff and at least nine other women.

58.     Plaintiff Kimberly Doe, a 38-year-old native and citizen of Brazil, was beaten and raped repeatedly by her drug-using husband in her home country.  For many years she felt helpless to escape his abuse, as he had almost unlimited authority to act as he chose and he threatened to kill her if she left.  Furthermore, the police in Brazil had a reputation of offering no assistance whatsoever to victims of sexual assault and domestic violence.

18

59.     Having finally determined that it was no longer in any way possible to stay and having found a mechanism for escape in November 2008, she made every effort to reach the United States, where she believed her husband could not find her and terrorize her.  She left her three children in the custody of her mother-in-law, who feared for Kimberly's life and supported her decision to leave.  Kimberly fled from Brazil to Guatemala to Mexico, but stalled out before reaching the United States border as the individual hired to assist her in transport abandoned her in Mexico.  Unable to return to her home country in the face of her husband's abuse and death threats, she returned to Guatemala until she could make another desperate, and this time successful, attempt to reach the United States in March 2010.  Given the democratic traditions of the United States and the prospect of safety from her husband, she placed all her hopes in securing asylum in this country.  Those hopes received a significant boost when an asylum officer interviewed her and found prima facie evidence in support of her claim, allowing her to be released from the Hutto detention facility on April 15, 2010.

60.     The relief and anticipation that Kimberly felt upon her release from Hutto turned to fear when she realized that only one officer, a male, would transport her to the Airport at 4:35 a.m.  She had expected that a female officer would transport her and became anxious and uncomfortable when she realized that Defendant Dunn alone would drive her to the Airport.

61.     When Defendant Dunn stopped unexpectedly at the JD's Conoco Station located at 20306 FM 973, Coupland, Texas 78615 (the "Conoco Station") after driving only a short while and demanded that Kimberly get out of the van and put her arms up, she knew something was terribly wrong.  Defendant Dunn groped her for an extended period of time, lifting her blouse and underwire bra and fondling her breasts and then touching her all over the rest of her body, including her crotch area and buttocks.

62.     Defendant Dunn then demanded that she re-enter the van, this time in the front seat.  He began driving again, but at the same time he was fondling himself and trying to touch Kimberly.  She was crying throughout.

63.     When Defendant Dunn made a second stop, simply pulling some distance off the road, and began assaulting her again, Kimberly feared the worst.  He continued to fondle himself and to touch her.  She clung to the car door and turned away from him in a desperate effort to buy time, believing that he would rape her, if she did not manage at a minimum to delay him. Having come from a situation involving repeated rapes and physical abuse at the hands of her husband and thus well aware of the violence of sexual predators, she believed that she would ultimately fail in her efforts and that Dunn would rape and kill her.

64.     Even after Dunn started the van back up again and dropped Kimberly off at the Airport, she felt horribly afraid and depressed.  The security and protection from abuse and assault she had hoped to find in the United States had failed to materialize.  Her self-esteem crumbled, and she despaired that she would find the sanctuary she hoped in the United States. She was and remains to this day deeply afraid that Defendant Donald Dunn will find her and retaliate against her for acknowledging he assaulted her.  She had received no information while in detention at the Hutto facility on her rights and remedies with respect to sexual assault and, in any event, felt so unsafe, terrified, and depressed that she did not report the incident.

65.     Kimberly suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

## VI.    Sexual Assaults Were Committed by Defendant Dunn on Other Female Detainees.

66.     Defendant Dunn's sexual assaults on Plaintiff Kimberly Doe were by no means isolated incidents.  On the contrary, as detailed more fully below, Defendant Dunn is known to have assaulted at least nine other female immigrant detainees besides Kimberly.  He was stopped only because one of these women reported what had happened to her and local police began an investigation following the attack on her.

## A.     Assaults Charged by the State of Texas, Williamson County

67.     On August 19, 2010, the Williamson County Sheriff's Department arrested Defendant Dunn and charged him with three counts of official oppression and two counts of unlawful restraint for attacks Dunn had committed within the borders of Williamson County itself.  One count of official oppression was predicated on Dunn's assault on Ms. Kimberly Doe.  The other two counts of official oppression were predicated on Dunn's assaults on Ms. Anna Roe and Ms. Sarah Doe, described below.  Defendant Dunn was charged with unlawful restraint in connection with his assaults on Ms. Beth Roe and Ms. Constance Roe, also described below.

### i.  Victim Anna Roe

68.     Anna Roe, a 26-year-old native and citizen of El Salvador, was transported by Donald Dunn from the Hutto facility to the Bus Station beginning at 4:56 a.m. on December 18, 2009.  There were no other escort officers present.  She was accompanied by one other female passenger, referenced in this Complaint as Georgina Roe.  Dunn stopped at the Conoco Station and told Anna and her companion to exit the van.  He had them raise their arms up and he began to touch them, lifting their shirts, putting his hands inside their clothes, and fondling their private parts.  When Anna tried to pull her shirt back down, Defendant Dunn grabbed her arms and forced them back up.  Dunn screamed at them both in English.  Dunn groped Anna and her companion for an extended period of time.

### ii.  Victim Sarah Doe

69.      Sarah Doe, a 24-year-old native and citizen of Eritrea, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 3:58 a.m. on March 20, 2010.  There were no other escort officers or passengers present.  Dunn stopped at the Conoco Station and demanded that Sarah get out of the van, take off her jacket, and press up against the wall of the gas station.  Dunn groped her for an extended period of time, touching all over her body, including her breasts, crotch area, and buttocks.

### iii.  Victim Beth Roe

70.      Beth Roe, a 32-year-old native and citizen of Honduras, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 3:24 a.m. on April 24, 2010. There were no other escort officers present.  Beth was accompanied by two other women, referenced in this Complaint as Constance Roe and Faith Roe respectively.  Dunn stopped at the Conoco Station and demanded that Beth and her companions exit the van.  He then stood them in a row and began touching them all over their bodies.

### iv.  Victim Constance Roe

71.      Constance Roe, a 35-year-old native and citizen of Brazil, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 3:24 a.m. on April 24, 2010. There were no other escort officers present.  Constance was accompanied by two other women, referenced in this Complaint as Beth Roe and Faith Roe respectively.  Dunn stopped at the Conoco Station and demanded that Constance and her companions exit the van.  He then stood them in a row and began groping them all over their bodies.  When Constance saw that it was her turn, she admonished Dunn in halting English, and he groped her wrists and waist but did not touch her breasts or privates.

72.     During the course of the Williamson County investigations into his conduct, Defendant Dunn admitted that his conduct was designed only for his own self-gratification and not for any legitimate purpose.

73.     On November 9, 2010, Defendant Dunn pleaded guilty to the Williamson County charges and was sentenced to one year in jail, along with a period of probation.

### B.     Additional Assaults Charged By the United States

74.     On March 24, 2011, the federal government filed a Criminal Information in the Western District of Texas, Austin Division, against Dunn, predicated on four sexual assaults on women beyond those described in the Williamson County case.  The federal government charged Dunn with four counts of deprivation of civil rights under color of law without due process of law.  The victims were Dora Roe, Emily Roe, Faith Roe, and Raquel Doe, described below.

#### i.  Victim Dora Roe

75.     On December 24, 2009, according to the Criminal Information filed by the federal government, Defendant Dunn sexually assaulted Ms. Dora Roe, a female immigrant detainee at Hutto, touching her breasts in a sexual manner.  On information and belief, Dunn was transporting Ms. Dora Roe to the Airport.  On information and belief, one other female detainee accompanied them during this transport.  On information and belief, the transport began at 4:56 a.m.

#### ii.  Victim Emily Roe

76.     Emily Roe, a 29-year-old native and citizen of El Salvador, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 5:36 a.m. on March 20, 2010, just after Dunn had returned from his sexual assault on Sarah Doe.  There were no other escort officers or passengers present.  Dunn stopped at his own personal residence and demanded that

Emily get out of the van and enter his house.  Inside his residence, Dunn groped Emily for an extended period of time, touching all over her body, including her legs, buttocks, and breasts.

### iii.  Victim Faith Roe

77.     On April 24, 2010, according to this Criminal Information, Defendant Dunn sexually assaulted Ms. Faith Roe, touching her breasts and buttocks in a sexual manner.  On information and belief, Dunn assaulted Faith Roe during the same transport in which he assaulted Ms. Beth Roe and Ms. Constance Roe as detailed above.

### iv.  Victim Raquel Doe

78.     Raquel Doe, a 35-year-old native and citizen of Guatemala, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 6:44 a.m. on May 6, 2010. There were no other escort officers or passengers present.  About half an hour into the trip, Dunn pulled off the road and forced Raquel out of the van.  He told her to put her arms up and then began to pull her clothes up and to fondle her and himself.  He demanded that Raquel get back in the van, where he began pulling off his own clothes and hers.  He exposed himself and became fiercely angry when Raquel resisted him.  Pressed for time, Dunn eventually drove her to the Airport.  Raquel ran out of the van and reported the incident with Dunn to individuals at the Airport.  She thus triggered the investigation into Dunn's activities which ultimately resulted in the Williamson County and federal charges.

79.     On September 7, 2011, Dunn pleaded guilty to two out of the four federal charges and was sentenced in November 2011.  Among other things, Dunn expressly agreed that the government's evidence would prove beyond a reasonable doubt that he had engaged in criminal conduct with respect to Ms. Raquel Doe as well as Ms. Emily Roe, Ms. Dora Roe, and Ms. Faith Roe.

## C.   Additional Assaults Not Used as the Basis for Criminal Charges

### i.  Victim Georgina Roe

80.     Georgina Roe, a 31-year-old native and citizen of Honduras, was transported by Donald Dunn from the Hutto facility to the Airport beginning at 4:56 a.m. on December 18, 2009.  There were no other escort officers present.  She was accompanied by one other female passenger, referenced above as Anna Roe.  Dunn stopped at the Conoco Station and told Georgina and her companion to exit the van.  He had them raise their arms up and he began to touch them, lifting their shirts, putting his hands inside their clothes, and fondling their private parts.  Dunn screamed at them both in English.  Dunn groped Georgina and her companion for an extended period of time.

### ii.  Other Victims

81.     Defendant Dunn transported at least 51 female immigrant detainees besides the ten victims referenced above either to the Airport or to the Bus Station during the course of his employment at Hutto.  On many occasions, he transported these women between midnight and 6 a.m.  Given Defendant Dunn's behavior patterns established by the facts as recounted above and by his own admissions, it is likely that he assaulted other women as well in the same or similar fashion.  Indeed, Defendant Dunn admitted to Williamson County authorities that he had committed such violations against 50% to 75% of the women he transported.  Further confirming this admission, Dunn picked out photographs during the Williamson County investigation of at least 13 women that he believed he assaulted without including the ten known victims referenced above.  Nevertheless, ICE and ICE officers did nothing to hinder his activities in this regard.

82.     In statements to authorities, Dunn expressly stated that, after he assaulted his first victim, he had fears that officials might put a stop to it.  When nothing happened, he knew he

could proceed unhindered and moved on to assault many, many others, including Plaintiff

Kimberly Doe.

## VII.   ICE's Failure To Remedy Continued Risk of Sexual Assault at Hutto Generally, and Victims' Vulnerability to Deportation Specifically, Compounded Plaintiff's Difficulty in Seeking or Obtaining Remedies for Her Assault.

83.   The victims assaulted by Defendant Dunn faced particular and unique difficulties

in reporting their assaults or seeking remedies.  In fact, their experiences as immigrants presented

them with difficulties of this kind from the start.  As the National Prison Rape Elimination

Commission found in a June 2009 report,

> [t]hose who have already suffered terrifying experiences in their home countries or in the United States can be almost defenseless by the time they are detained and may even expect to be abused.  . . . [Furthermore,] [s]exual abuse victims may be perceived as disgracing the family and even be at risk for retaliation by their own family members. This added danger, coupled with unfamiliarity with the processes of reporting or even with the right to report, makes it even less likely that immigration detainees will disclose sexual abuse experiences.[23]

84.   Moreover, because Dunn assaulted them while conveying them to catch either an

airplane or a bus that would carry them out of the local area, his victims could not easily report

the situation to anyone in the locale in which the events occurred.

85.   Even after escaping Donald Dunn, each woman faced the continued challenge of

obtaining status in the United States, compounded by the fear that Donald Dunn could negatively

affect her immigration cases if he so desired.  Having failed to protect these women from sexual

assault, ICE and ICE officials owed these women a duty to assist them in taking the necessary

steps to seek some sort of remedy.  On information and belief, ICE and ICE officials neither

succeeded nor even attempted to provide these victims, including Plaintiff, any relevant

assistance or remedy whatsoever.

---

[23] National Prison Rape Elimination Commission Report, June 2009, pp. 22, 180.

## VIII.  ICE Wrongfully Failed To Protect Plaintiff from the Obvious Risk of Sexual Assault.

86.     Having evidenced its recognition of rampant problems with sexual abuse at its detention facilities over the course of decades by designing relevant contractual provisions and standards to prevent such abuse, ICE nevertheless willfully blinded itself to open and obvious violations of those provisions of standards by male escort officers at Hutto.  ICE employed at minimum a Contracting Officer—Jerald Neveleff—and a Contracting Officer's Technical Representative—George Robertson—to ensure proper administration of and compliance with the applicable contracts during the times of Dunn's sexual assault rampage in late 2009 and the first half of 2010.  Not only did these officials not ensure compliance with the contractual provision and standards set up to prevent sexual assault on Plaintiff and other women like her, but they knowingly and/or recklessly and negligently ignored the fact that male escort officers routinely violated the provision and standards under circumstances most likely to result in sexual assault.

87.     As explained in Attachment 1, § 3(c) to the IGSA, as Contracting Officer, Jerald Neveleff was "responsible for the complete conduct and integrity of the contracting process, including administration after award."  As articulated in Attachment 3, § 1, to the IGSA, "[t]he role of the Government in quality assurance [was] to ensure performance standards are achieved and maintained."

88.     Under Article II.D of the IGSA, as part of this administration process, Neveleff was required personally to "approve [CCA's] policies and procedures for use under [the IGSA]."  Likewise, Article XVIII.A of the IGSA mandated that CCA "establish and maintain a complete Quality Control Program (QCP) acceptable to the Contracting Officer, in consultation with the COTR, to assure the requirements of [the IGSA] are provided."

89.     In general, Neveleff himself recognized in an email communication that the Hutto facility "house[d] residents that [were] the ultimate responsibility of ICE, [and that] there [was] a need to make sure that anything related to the facility [did] not interfere with the best interest and protection of the residents."  November 9, 2007, Email from Jerald Neveleff to Hal Hawes.

90.     As explained in Attachment 1, § 3(c) to the IGSA, George Robertson, as COTR, was an "employee of ICE responsible for monitoring all technical aspects and assisting in administering the contract."

91.     As noted in Attachment 3, § 4, of the IGSA, the COTR at Hutto would be an on-site official, tasked with regular inspections and assessing overall performance by reviewing specific items in the areas covered by the relevant performance standards and by monitoring relevant activities at Hutto.

92.     Attachment 3, § 3, of the IGSA required that CCA make a wide variety of documents available for the COTR's inspection as part of this review and monitoring process, including, among other things, written policies and procedures, logbooks and other reports, and contract discrepancy reports ("CDRs").

93.     The IGSA expressly required the COTR to review such documentation "to affirm that the facility conditions, policies/procedures, and handling of residents all conform to the performance standards" put forward in the IGSA.  (IGSA, Att. 3, § 4.3).

94.     Jerald Neveleff, as Contracting Officer for ICE, signed the IGSA on January 27, 2010, and was thus aware of Article III.D of the IGSA, pursuant to which "[d]uring all transportation activities, at least one (1) transportation officer shall be of the same sex as the residents being transported."

95.     Neveleff and his COTR, George Robertson, had direct responsibilities with regard to transport issues.  Under Article III.D of the IGSA, CCA would provide, "upon request and as scheduled by the COTR or Contracting Officer, necessary escort and transportation services for residents to and from designated locations."  Moreover, pursuant to Attachment 1, § 4(b)(21)(b)(1), CCA had to "provide transportation services as may be required to transport residents securely, in a timely manner, to locations as directed by the COTR."  Pursuant to Attachment 1, § 4(b)(21)(b)(4), "[t]ransportation routes and scheduling [had to] be accomplished in the most economical manner as approved by the COTR."

96.     Moreover, pursuant to Attachment 1, § 4(b)(21)(f), to the IGSA, CCA "had to establish a communication system that [had] direct and immediate contact with all vehicles . . . . Upon demand, ICE [would] be provided with [the] current status of all vehicles . . . ."  Thus, the IGSA contemplated ICE and its officials having direct involvement with details of transports.

97.     In its Performance Requirements Summary (Att. 3, § 9.1), the IGSA references Sexual Assault as an area in which ICE imposed performance standards applicable to the Hutto facility.  Indeed, the IGSA specifically referenced sexual abuse as an event that constituted a failure to meet performance standards and that could trigger immediate contractual penalties. (IGSA, Att. 3, § 6).  Neveleff and Robertson had direct responsibilities for ensuring that these performance standards were met.

98.     The IGSA further required immediate notice to both the Contracting Officer and the COTR in case of any sexual assault, thus further emphasizing the involvement of these ICE officials in such matters.  (IGSA, Article XVI.F; Att. 3, § 7(c)).

99.     As a general matter, ICE officials recognized, as noted above, that the Hutto facility "house[d] residents that [were] the ultimate responsibility of ICE, [and that] there [was] a

29

need to make sure that anything related to the facility [did] not interfere with the best interest and protection of the residents."  November 9, 2007, Email from Jerald Neveleff to Hal Hawes. Sexual assaults by male escort officers against Plaintiff Kimberly Doe and other women during transport from the Hutto facility both related to that facility and interfered with the best interest and protection of the residents.  ICE had a direct responsibility to take the measures necessary to prevent such sexual assaults.

100.    Nevertheless, ICE allowed repeated violations of applicable contracts, policies, and standards designed to protect Plaintiff Kimberly Doe and other women like her from the clear and obvious risk of assault and sexual assault by male escort officers.

101.    Had ICE officials not maintained a posture of deliberate indifference and negligence with respect to these violations and the clear and obvious risk of assault and sexual assault attendant upon them, they could easily have taken preventative measures by insisting on compliance with the applicable contracts, policies, and standards.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Negligence**
**Pursuant to Federal Tort Claims Act; Texas Common Law**

102.    Plaintiffs incorporate paragraphs 1 through 101 as set forth above.

103.    ICE and its officials—including Jerald Neveleff and George Robertson—had a legal duty to Plaintiff to protect her from sexual assault and from official oppression during transport to and from ICE detention facilities.

104.    As detailed throughout this Complaint, ICE and its officials—including Jerald Neveleff (as Contracting Officer) and George Robertson (as Contracting Officer's Technical

Representative) breached their legal duty to protect Plaintiff from sexual assault during transport to and from ICE detention facilities by (1) willfully blinding themselves to the need to implement steps to prevent sexual assault during transport activities, even when those steps were required by applicable contracts, policies, and standards; and (2) failing appropriately to put a stop to transport activities which they knew to be proceeding in violation of applicable contracts, policies, and standards, under circumstances in which they knew that the applicable contracts, policies, and standards were designed to prevent sexual assault on Plaintiff and others like her.

105.    The risk of assault and sexual assault on Plaintiff and others like her under these circumstances was clear, obvious, and ongoing.

106.    Under the Federal Tort Claims Act, Defendant United States is liable for these actions and omissions, including those by Neveleff and Robertson, who were federal employees acting within the scope of their office or employment during the relevant time periods.

107.    As a direct and proximate result of the negligence of ICE and its officials— including Jerald Neveleff and George Robertson, Plaintiff suffered substantial injuries and damages, including severe mental and emotional distress.

## <u>SECOND CAUSE OF ACTION</u>

### Negligent Monitoring
### Pursuant to Federal Tort Claims Act; Texas Common Law

108.    Plaintiffs incorporate paragraphs 1 through 107 as set forth above.

109.    ICE and its officials—including Jerald Neveleff and George Robertson—had a legal duty to Plaintiff to monitor transports of female detainees to and from ICE detention facilities to a sufficient degree to ensure that escort officers complied with contractual provisions and ICE policies designed to protect the transported detainees from sexual assault.

110.    As detailed throughout this Complaint, ICE and its officials—including Jerald Neveleff (as Contracting Officer) and George Robertson (as the Contracting Officer's Technical Representative) breached their legal duty to monitor transports of female detainees.

111.    The risk of assault and sexual assault on Plaintiff and others like her under these circumstances was clear, obvious, and ongoing.

112.    Under the Federal Tort Claims Act, Defendant United States is liable for these actions and omissions, including those by Neveleff and Robertson, who were federal employees acting within the scope of their office or employment during the relevant time periods.

113.    As a direct and proximate result of the negligent monitoring by ICE and its officials—including Jerald Neveleff and George Robertson, Plaintiff suffered substantial injuries and damages, including severe mental and emotional distress.

## PRAYER FOR RELIEF

114.    Wherefore, Plaintiffs respectfully request that, after due proceedings, judgment be entered in favor of Plaintiff, and that the Court award the following relief to Plaintiffs:

- All compensatory damages reasonable under the circumstances;

- Reasonable attorneys' fees and court costs under 42 U.S.C. § 1988, 28 U.S.C. § 2412, and other applicable law;

- Legal interest on all damages awarded from the date of judicial demand until paid; and

- Such other and further relief as this Court deems just and proper.

Dated:  July 6, 2012

Respectfully Submitted,

 /s/ Mark Whitburn_____

**Attorneys for Plaintiffs**

**Mark Whitburn**
Texas Bar No. 24042144
**Whitburn & Pevsner, PLLC**
P.O. Box 270247
Austin, Texas 78727
Tel: (682) 521-4789
Fax: (512) 519-2098
mwhitburn@whitburnpevsner.com

**Lisa Graybill**
Texas Bar No. 24054454
(Of Counsel)
**Whitburn & Pevsner, PLLC**
P.O. Box 270247
Austin, Texas 78727
Tel: (512) 478-7300
Fax: (512) 519-2098
lgraybill@whitburnpevsner.com

William O. Whitehurst
**Whitehurst, Harkness, Brees & Cheng, P.C.**
5113 Southwest Parkway, Suite 150
Austin, Texas 78735
Tel: (512) 476-4346
Fax: (512) 476-4400
bwhitehurst@austintriallaw.com